# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ASHLEIGH C., | ) |
| Plaintiff, | ) |
| v. | ) No. 18 C 2209 |
| ANDREW M. SAUL, | ) Magistrate Judge Finnegan |
| Commissioner of Social Security, | ) |
| Defendant. | ) |

## ORDER

Plaintiff Ashleigh C. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the case should be reversed or remanded. The Commissioner responded with a competing memorandum in support of affirming the decision. After careful review of the record, the Court grants judgment in favor of the Commissioner.

## BACKGROUND

Plaintiff's father applied for SSI on his minor daughter's behalf on June 9, 2008, alleging disability since January 1, 2006 due to a variety of mental impairments. (R. 236). Born in August 1999, Plaintiff was a school-age child (nearly 9 years old) at the time of the application. (R. 213). On March 11, 2010, administrative law judge ("ALJ") Adrian Diane Horowitz found that Plaintiff's attention deficit hyperactivity disorder ("ADHD"), learning disability, and adjustment disorder caused marked limitations in acquiring and

using information, and in attending and completing tasks. (R. 87). As a result, Plaintiff was disabled from the January 1, 2006 alleged onset date through the date of the decision. (R. 87-90).

Plaintiff received Child SSI benefits until August 30, 2015, at which point the Social Security Administration determined that the then 16-year-old adolescent was no longer disabled. (R. 14, 91-92). A State agency Disability Hearing Officer upheld that decision on August 30, 2016. (R. 161-74). Plaintiff's grandmother filed a timely request for a hearing, and both she and her granddaughter, appearing *pro se*, provided testimony before ALJ William Spalo on April 26, 2017. (R. 38-40). Six months later, on October 12, 2017, the ALJ found that Plaintiff experienced medical improvement as of August 30, 2015, and that she had not become disabled again after that date. (R. 14-29). The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by this Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

In this appeal, Plaintiff seeks to recover Child SSI from August 30, 2015 through August 31, 2017, the date she turned 18 and needed to be re-evaluated as an adult. (Doc. 24, at 7). In support of her request for reversal or remand under sentence four of the Social Security Act, Plaintiff argues that the ALJ: (1) erred in weighing the opinions from two of her treating physicians; and (2) improperly concluded that she experienced medical improvement as of August 30, 2015. Alternatively, Plaintiff asks the Court to remand the case under sentence six of the Act for consideration of new evidence. For reasons discussed in this opinion, the Court finds that the ALJ's decision is supported by substantial evidence and there are no errors warranting reversal or remand. In addition,

Plaintiff's new evidence is not material and so does not support a remand pursuant to sentence six.

## DISCUSSION

### A. Standard of Review

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the Social Security Act. In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulation. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations. *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making its determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). Where the Commissioner's decision, "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."

3

*Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

**B.     Framework for Child SSI Benefits**

A child is disabled within the meaning of the Social Security Act if she has a "physical or mental impairment, which results in marked and severe functional limitations, and . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). In determining whether a child meets this definition, the ALJ engages in a three-step analysis: (1) if the child is engaged in substantial gainful activity, then her claim is denied; (2) if the child does not suffer from a severe impairment or combination of impairments, then her claim is denied; and (3) the child's impairments must meet, medically equal, or be functionally equal to any of the Listings of Impairments contained in 20 C.F.R. pt. 404, subpt. P, App. 1., 20 C.F.R. § 416.924(b)-(d). *See also Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007).

To determine whether an impairment functionally equals a listing, the ALJ must assess its severity in six age-appropriate categories: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). Each domain describes what a child should be able to do throughout five age categories: (1) "newborns and young infants" (birth to age 1); (2) "older infants and toddlers" (age 1 to age 3); (3) "preschool children" (age 3 to age 6, including children in kindergarten but not first grade); (4) "school-age children" (age 6 to age 12, including children in first grade through middle school); and (5) "adolescents" (age 12 to age 18). 20 C.F.R. § 416.926a(g)(2), (h)(2), (i)(2), (j)(2), (k)(2), (l)(2).

4

An impairment functionally equals a listing if it results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain. A marked limitation "interferes 'seriously' with the child's ability to independently initiate, sustain, or complete activities in the domain, and an 'extreme' limitation interferes 'very seriously.'" *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 679 (7th Cir. 2010). The functional equivalence analysis requires the ALJ to consider how the child functions as a whole. "[T]his consists of looking at all of the child's activities, which include everything the child does at home, at school, and in her community, and evaluating how the child is limited or restricted in those activities, without cabining the child's impairments into any particular domain." *Bielefeldt ex rel. Wheelock*, No. 09 C 50302, 2011 WL 3360013, at *4 (N.D. Ill. Aug. 4, 2011) (citing 20 C.F.R. § 416.926a(b)-(c)).

**C.     Analysis**

    **1.     Treating Physician Opinions**

Plaintiff argues that the case must be reversed or remanded because the ALJ failed to properly weigh the opinions from her treating pediatricians, Stephen H. Sheldon, D.O., and Mary E. Fournier, M.D. A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. §§ 416.927(c)(2); *see Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). If the opinion is contradicted by other evidence or is internally inconsistent, the ALJ may discount it so long as she provides an adequate explanation for doing so. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir.

2007). That is to say, the ALJ must offer "good reasons" for discounting a treating physician's opinion, *Brown*, 845 F.3d at 252, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the attention of the ALJ. 20 C.F.R. § 416.927(c)(2)-(6); *see Simila*, 573 F.3d at 515.

Dr. Sheldon treated Plaintiff from 2010 through 2017, and Dr. Fournier treated her from at least September 2014 through 2016. The ALJ never mentioned either physician by name but he did reference numerous pages of their treatment notes and associated findings. (R. 20, 21, 25, 27, 28) (citing, *e.g.*, R. 975, 977, 980, 982, 1085, 1290, 1299, 1300, 1317, 1342, 1348, 1353, 1354, 1360, 1371, 1382, 1390). Plaintiff argues that this is inadequate because the ALJ failed to assign any specific weight to the doctors' opinions. (Doc. 24, at 10). The Commissioner responds that Dr. Sheldon and Dr. Fournier never gave any "opinions" for the ALJ to weigh, but merely documented Plaintiff's care in treatment notes. (Doc. 31, at 3).

Before addressing the treatment notes, the Court first discusses two letters from Dr. Sheldon that Plaintiff says are themselves medical opinions. In one letter dated November 3, 2014, Dr. Sheldon stated that Plaintiff suffers from narcolepsy with cataplexy and then proceeded to describe the symptoms generally associated with those conditions. He characterized narcolepsy as a "disabling life-long disorder of sleep regulation that affects the control of sleep and wakefulness," and outlined the "four classic

6

symptoms" of the disorder. Dr. Sheldon provided a similar recitation of symptoms associated with cataplexy. (R. 975). The second October 26, 2017 letter followed the same format, with Dr. Sheldon confirming that Plaintiff suffers from narcolepsy and discussing typical symptoms. (R. 1396).

The Social Security Administration defines medical opinions as "'statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity' of a claimant's impairments, including the claimant's symptoms, diagnosis, prognosis, physical and mental restrictions, and residual functional capacity." *Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016). *See also* 20 C.F.R. § 416.927(a)(1). Neither of Dr. Sheldon's letters satisfies this definition. Rather than providing specific information about Plaintiff's symptoms, her prognosis, or her ability to function in the six relevant domains, the letters speak in general terms about the development, nature, and severity of symptoms people with narcolepsy may experience. As Dr. Sheldon made clear, these symptoms "vary widely among individuals with the disorder." (R. 975, "Disturbed nighttime sleep, including tossing and turning in bed, leg jerks, nightmares, and frequent awakenings *may* . . . occur") (emphasis added). (*See also* R. 1396, describing the "most common" symptoms of narcolepsy that "may" affect "[p]eople with narcolepsy."). Generic statements about narcolepsy and cataplexy that are wholly untethered to Plaintiff's own experiences do not qualify as "medical opinions."

Turning to the treatment notes, courts appear to have endorsed a distinction between notes containing only symptoms and diagnoses, which generally are not medical opinions, and treatment notes providing a "prognosis, what the claimant can still do despite the impairment, and any physical or mental restrictions," which are medical

7

opinions. *See Horr v. Berryhill*, 743 F. App'x 16, 20 (7th Cir. 2018) (treating physician's reports not medical opinions where they contained "symptoms and diagnoses, but not a prognosis, a discussion of what [the plaintiff] can still do despite the impairment, or an assessment of her physical restrictions.") (citing *House v. Berryhill*, No. 1:17-CV-2109-SEB-TAB, 2018 WL 1556173, at *6 (S.D. Ind. Mar. 30, 2018)) (the findings from a cardiopulmonary stress test report summarized by a treating physician "strain the regulatory definition of a 'medical opinion.'"). That said, the parties do not cite, and this Court was unable to find any cases in this jurisdiction that deemed treatment notes to be a medical opinion.

Most of the statements from the treatment notes that Plaintiff says qualify as medical opinions are simply recitations of her symptoms and diagnoses, and many of them fall within the disability period in any event (prior to August 30, 2015). (Doc. 24, at 4-5; Doc. 39, at 3-4) (citing R. 980, 2/27/2013 Dr. Sheldon note that Plaintiff has "a history of profound daytime sleepiness, unintentional sleep episodes and sleep attacks"; R. 1284, 3/4/2013 Dr. Sheldon note that Plaintiff "clearly has narcolepsy with cataplexy"; R. 965, 1342, 5/22/2014 Dr. Sheldon note that Plaintiff "still feels tired all the time," "will not be able to stay awake" during medication holidays, is struggling in afternoon classes because she is falling asleep, and takes long afternoon naps and has difficulty arousing from them; R. 1348, 8/21/2014 Dr. Sheldon note that Plaintiff "has been more tired"; R. 1389, 11/10/2016 Dr. Sheldon note that Plaintiff was "excessively sleepy in the afternoon and has some trouble focusing"; R. 969-72, 9/25/2014 Dr. Fournier note that Plaintiff suffers from ADD (attention deficit disorder), idiopathic hypersomnia, other organic parasomnia, and narcolepsy with cataplexy; R. 1079-84, 8/17/2015 Dr. Fournier note

8

documenting a past history of narcolepsy and ADHD; R. 1086, 9/28/2015 Dr. Fournier note that Plaintiff was waking during the night; R. 1375-80, 6/6/2016 Dr. Fournier note that Plaintiff has narcolepsy). These are not medical opinions. *Compare Nagel v. Colvin*, No. 14 C 8060, 2016 WL 278881, at *3, 5 (N.D. Ill. Jan. 22, 2016) (remand necessary where the ALJ failed to consider or assign weight to a treating physician's "Pain Report" setting forth restrictions on the plaintiff's ability to stand, walk, concentrate, and "function in a competitive work setting." 2016 WL 278881, at *3, 5. Contrary to Plaintiff's assertion, moreover, Dr. Fournier's recommendation in the June 6, 2016 note that Plaintiff "follow up" with Dr. Sheldon is not a "prognosis" about the expected progression of her condition. (Doc. 39, at 4; R. 1376).

Even assuming that the treatment notes from Dr. Sheldon and Dr. Fournier constitute medical opinions, the Court agrees with the Commissioner that any error the ALJ made in failing to assign them a specific weight was harmless. *See Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (applying harmless error review to ALJ's determination). As stated, several of the notes are dated prior to August 30, 2015 and so fall within the period of disability. Since Plaintiff had already obtained a favorable outcome, it would be pointless to remand the case to see whether treatment notes from that period may be afforded controlling weight. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013) ("[W]e will not remand a case to the ALJ for further explanation if we can predict with great confidence that the result on remand would be the same.").

A different calculus applies to the treatment notes from August 30, 2015 forward, but as discussed in further detail below, most of those records show that Plaintiff was functioning very well and her symptoms were well controlled with medication. (R. 25)

9

(stating that medication "has been effective in controlling" Plaintiff's narcolepsy with cataplexy and ADHD). Accepting Plaintiff's premise that these notes are entitled to controlling or at least great weight, they support a finding that she medically improved. (*See* R. 21-28) (citing R. 1359, 8/17/2015 Dr. Fournier note that Plaintiff had a normal exam with no problems at home or school; R. 1085-86, 9/28/2015 Dr. Fournier note that Plaintiff was "very busy in school – band, theater, clubs," and had no fatigue despite waking during the night; R. 1371, 9/28/2015 Dr. Sheldon note that Plaintiff's narcolepsy with cataplexy "appears to be under good control" with medication, and she has no unintentional sleep episodes or sleep attacks; R. 1377-80, 6/6/2016 Dr. Fournier note that Plaintiff was "doing well at school" and "has been overall well"; R. 1382-83, 10/17/2016 Dr. Fournier note that Plaintiff's narcolepsy "has been stable" and she was "doing well" in school; R. 1389-90, 11/10/2016 Dr. Sheldon note that Plaintiff was "excessively sleepy in the afternoon and has some trouble focusing" but was doing very well in school with no unintentional sleep episodes or sleep attacks, and her narcolepsy was "[u]nder good control."). In such circumstances, it is reasonably certain that remanding the case so the ALJ can assign a specific weight to these treatment notes would not change the outcome.

Viewing the record as a whole, the ALJ did not commit reversible error by failing to assign weight to the treatment notes from Dr. Sheldon and Dr. Fournier. Plaintiff's request to remand the case for further analysis of that issue is denied.

### 2. Medical Improvement

Plaintiff argues the case still must be remanded because the ALJ erred in finding that she experienced medical improvement as of August 30, 2015. Medical improvement is defined as "any decrease in the medical severity of your impairment(s) which was

present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 416.994(b)(1)(i). A finding of decreased medical severity must be based on "changes in the symptoms, signs or test results associated with [the claimant's] impairment(s)." *Id.*; *Tumminaro v. Astrue*, 671 F.3d 629, 633 (7th Cir. 2011). If an ALJ finds medical improvement, he must next consider whether the impairments the child had at the time of the most recent favorable decision (i.e., the Comparison Point Decision ("CPD")), still meet or equal a listing. If not, the ALJ then considers whether the child has any other severe impairments that meet or equal a listing. *See Barnes-Atterberry for AMR v. Berryhill*, No. 17 C 403, 2018 WL 1508711, at *1 (S.D. Ill. Mar. 27, 2018). The parties agree that the CPD in this case is March 11, 2010, the date ALJ Horowitz found Plaintiff to be disabled.

ALJ Spalo first determined that "[t]he medical evidence supports a finding that, as of August 30, 2015, there had been a decrease in medical severity of the impairments present at the time of the CPD." (R. 18). Plaintiff argues that this statement is deficient because the ALJ failed to provide any explanation for his conclusion. Though this section of the decision is terse, the ALJ went on to explore all of the evidence indicating that Plaintiff's condition had improved. The ALJ also gave great weight to the June 19, 2015 and November 2, 2015 opinions from State agency reviewers who unanimously found medical improvement. (R. 25-26, 1038, 1044, 1100, 1106). Plaintiff does not address these findings or point to any contrary opinions. *See Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) (stating that "it is proper to read the ALJ's decision as a whole.").

ALJ Spalo next considered whether the impairments Plaintiff had at the time of the CPD (ADHD, learning disability, and adjustment disorder), continued to functionally equal

11

a listed impairment as of August 30, 2015.  (R. 18).  Addressing the six domains of functioning, the ALJ found Plaintiff to have less than marked limitation in acquiring and using information, less than marked limitation in attending and completing tasks, less than marked limitation in interacting and relating with others, no limitation in moving about and manipulating objects, no limitation in the ability to care for herself, and no limitation in health and physical well-being.  (R. 18-23).  Since Plaintiff no longer had a "marked" limitation in two domains of functioning, or an "extreme" limitation in one domain, the ALJ determined that she was not disabled from impairments present at the CPD as of August 30, 2015.  (R. 23).

The ALJ finally considered whether Plaintiff's additional impairments present on August 30, 2015 met or functionally equaled a listing.  The impairments included ADHD, migraines, narcolepsy, cataplexy, and asthma.  (R. 23).  The ALJ found that these impairments did not meet or medically equal a listed impairment, including Listing 103.3 pertaining to asthma, and Listing 111.00 pertaining to neurological disorders.  (R. 23-24).  As for whether the impairments functionally equaled a listing, the ALJ once again found less than marked or no limitation in the six domains of functioning.  (R. 26-28).  He thus concluded that Plaintiff's disability ended as of August 30, 2015 and she "has not become disabled again since that date."  (R. 28).

Plaintiff does not address these specific findings or provide a discussion of her functioning in any particular domain.  The Court thus focuses on the two domains where Plaintiff had a marked limitation prior to August 30, 2015, namely, acquiring and using information, and attending and completing tasks.  (R. 19).

12

### a. Acquiring and Using Information

The domain of acquiring and using information "refers to how well a child acquires or learns information and how well [s]he uses the information [s]he has learned." *Hopgood ex rel. L.G.*, 578 F.3d at 699. Adolescents between the ages of 12 and 18 (like Plaintiff) "should be able to demonstrate what they have learned in academic assignments and be able to use what they have learned in daily living situations without assistance (e.g., going to the store and using public transportation)." *Id.* (citing 20 C.F.R. § 416.926a(g)(2)(v). They should also be able to "comprehend and express both simple and complex ideas," use "complex language in learning and daily living situations," and "learn to apply these skills practically in order to enter the workplace after finishing school." *Id.*

In the March 2010 decision, ALJ Horowitz found Plaintiff markedly limited in this domain due in large part to her poor school performance. Plaintiff's elementary school stated that she had very serious problems acquiring and using information, needing constant redirection and prompting to complete tasks. (R. 89). In addition, her "inattentive behaviors often precluded her ability to understand and retain verbal instructions," and were "severely impacting her objective test scores." (R. 88, 89).

The record looked much different when ALJ Spalo reviewed Plaintiff's case in October 2017. On June 8, 2015, J. B. Goebel, Ph.D., completed a Mental Status Evaluation of Plaintiff and found her speech to be understandable and her conversation "relevant and coherent." (R. 19, 1034). Her Full Scale IQ score placed her within the average range of intellectual functioning. (R. 19, 1036). The ALJ noted that Plaintiff had an Individualized Education Plan ("IEP") due to her learning disability, but found it

13

significant that she was mostly taking general education classes with resource support. (R. 19). Plaintiff's teacher completed a questionnaire regarding her functioning on May 1, 2015 and reported only slight problems with comprehending and doing math, and applying previously learned material. (R. 19, 634). Plaintiff exhibited an obvious problem with providing organized oral explanations and adequate decisions, and expressing ideas in written form, but she was able to maintain a B average in high school and received As and Bs in several subject areas. (R. 19, 26, 634, 1141).

On June 6, 2016, Plaintiff told Dr. Fournier that she was "doing well" at school with no problems, getting "As and Bs mostly" and a C in History. (R. 26, 1377). Plaintiff continued to do well when she saw Dr. Fournier on October 17, 2016 and was in the process of applying to colleges. (R. 1383). During an October 27, 2016 IEP conference, Plaintiff's general education teacher indicated that she had "abstract/higher-level thinking skills," "[a]lways completes assignments," and was "highly motivated." The teacher described the quality of Plaintiff's work as "excellent," and identified her strengths as reading, reading comprehension, and writing skills. (R. 26, 1128, 1133). When Plaintiff saw Dr. Sheldon on November 10, 2016, she was still "doing very well in school and her grades [we]re A's and B's." (R. 1389). At the April 26, 2017 hearing, Plaintiff testified that she had been accepted to the University of Illinois in Springfield and planned to start classes there in the fall. (R. 19, 64).

Plaintiff does not address any of this evidence or explain how it undermines the ALJ's conclusion that she medically improved in her ability to acquire and use information, and had less than marked limitation in that domain as of August 30, 2015. Absent any developed argument on this issue, Plaintiff's request for remand on this basis is denied.

14

*Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) ("[P]erfunctory and undeveloped arguments . . . are waived.").

### b.     Attending and Completing Tasks

The domain of attending and completing tasks considers "how well the child is able to focus and maintain his attention, and how well he begins, carries through, and finishes his activities, including the pace at which he performs activities and the ease with which he changes them." *Hopgood ex rel. L.G.*, 578 F.3d at 700-01 (quoting 20 C.F.R. § 416.926a(h)). Adolescents should be able to "pay attention to increasingly longer presentations and discussions, maintain concentration while reading textbooks, independently plan and complete long-range academic projects, organize materials and plan time to complete school assignments." *Id*. Adolescents should also be able to "maintain attention on a task for extended periods of time and not be unduly distracted by peers or unduly distracting to them in a school or work setting." *Id*.

ALJ Horowitz found marked limitations in this domain in March 2010 given Plaintiff's "huge" problems with attention and focus. (R. 87). In school, Plaintiff would leave her seat and move about the classroom, and teachers documented a heightened level of distractibility, inattention, and impulsivity. Plaintiff also exhibited difficulty sustaining attention during class assignments, homework, and playing, and she was unable to follow through on instructions. School records confirmed Plaintiff had serious or very serious limitations in attending and completing tasks. (R. 88, 89).

Once again, the evidence available to ALJ Spalo in October 2017 was significantly different. Medical records showed that Plaintiff's ADHD was well controlled with medication and her family expressed no concerns about her behavior. (R. 20). Her

15

teachers documented serious problems completing homework assignments and working at a reasonable pace/finishing on time, but she nonetheless managed to maintain a B average and graduated on time. She also got accepted to college, "reflecting that she full[y], accurately, and timely submitted her college applications." (R. 20). During the October 2016 IEP conference, Plaintiff "appeared to devote her full effort and attention to the tasks that the examiner asked her to do." (R. 27, 1138). Moreover, Plaintiff was able to participate in several school activities, including band, theatre, art club, gamers club, cinema club, and book club. (R. 27).

Plaintiff largely ignores this evidence and the numerous medical records showing her narcolepsy was stable and under good control with medication. (R. 1080, 1085-86, 1371, 1377-80, 1382, 1385, 1389-91). *See also Crespo*, 824 F.3d at 674. The ALJ did not commit reversible error in finding that Plaintiff experienced medical improvement in her ability to attend and complete tasks, and had less than marked limitation in that domain as of August 30, 2015.

### c. Summary

Viewing the record as a whole, and given Plaintiff's failure to address significant evidence cited in the ALJ's decision, the finding of medical improvement is supported by substantial evidence and the case need not be remanded for further consideration of that issue.

### 3. New Evidence

In her reply brief, Plaintiff asks the Court to remand the case so the ALJ can consider two new documents she has submitted pertaining to her condition. The first is a March 6, 2019 college transcript from the University of Illinois showing that for the Fall

2017 semester, Plaintiff earned a C in one class, a D+ in another, withdrew from a third, and earned no credit in a fourth. The transcript also shows that for the Spring 2018 semester, Plaintiff received Fs in two classes and a C in a third class. (Doc. 39, at 14). The second document is a May 16, 2018 treatment note from Dr. Fournier indicating that Plaintiff was having a difficult time at college and was on academic probation. Her medication was not lasting through the day, she was "out of it" in the afternoon, she was falling asleep in English class sometimes, and she was falling asleep on a daily basis when not intending to. (*Id.* at 19). Dr. Fournier diagnosed Plaintiff with narcolepsy, mild depression, and obesity. Since Plaintiff said she was moving to Florida to live with her father, Dr. Fournier determined it did not make sense to change her medication regimen and so just refilled her prescription for Concerta and gave her a prescription for Ritalin for use on an as-needed basis. (*Id.* at 22).

Sentence six of 42 U.S.C. § 405(g) authorizes courts to remand a case to the Commissioner if "the claimant submits 'new and material evidence' that, in addition to the evidence already considered by the ALJ, makes the ALJ's decision 'contrary to the weight of the evidence' in the record." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). Evidence is considered "material" if there is a "reasonable probability that the ALJ would have reached a different conclusion had the evidence been considered." *Schmidt*, 395 F.3d at 742. "Medical evidence postdating the ALJ's decision, unless it speaks to the patient's condition at or before the time of the administrative hearing, could not have affected the ALJ's decision and therefore does not meet the materiality requirement." *Getch*, 539 F.3d at 484.

Here, the transcript and treatment note both postdate the ALJ's October 12, 2017 decision, and neither addresses Plaintiff's condition at or before the April 26, 2017 administrative hearing. The evidence is therefore not material for purposes of sentence six. The Court recognizes that Plaintiff's new diagnoses of depression and obesity, combined with her struggles in college, may indicate that her condition has once again worsened since the ALJ's October 2017 decision. If so, Plaintiff's recourse is to file a new application for benefits, not seek to revisit the current application. *Getch*, 539 F.3d at 484 ("If Mr. Getch has developed additional impairments, or his impairments have worsened, since his first application for benefits, he may submit a new application."). *See also McFadden v. Astrue*, 465 F. App'x 557, 560 (7th Cir. 2012) (evidence which shows that an impairment has worsened "is not material because it does not describe [the plaintiff's] condition in the period before the ALJ rendered her decision."). Notably, since Plaintiff turned 18 on August 31, 2017 and concedes she was no longer entitled to child benefits after that date, she would need to file a new application for benefits in any event.

To summarize, the new documents Plaintiff submitted to the Court do not have any bearing on Plaintiff's condition at or before the time of the administrative hearing. *Getch*, 539 F.3d at 484. As a result, they are not material for purposes of a sentence six remand, and Plaintiff's request for a ruling in her favor on that basis must be denied.

## **CONCLUSION**

For the reasons stated above, Plaintiff's request to remand the case is denied, and the Commissioner's request to affirm the ALJ's decision is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated: October 4, 2019

/s/ Sheila Finnegan
_____
SHEILA FINNEGAN
United States Magistrate Judge